In the Matter of the Application of Northern States Power Company for an Increase in Rates for Electric Service.

**NORTHERN STATES POWER COMPANY, Appellant,**

v.

Bruce HAGEN, Leo Reinbold, and Richard Elkin, as members of the North Dakota Public Service Commission, Shark Bros., Inc., and North Dakota Community Action Association, Appellees.

Civ. No. 10017.

Supreme Court of North Dakota.

Dec. 22, 1981.

R. W. Wheeler of Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, Gene R. Sommers, Minneapolis, Minn., and Briggs & Morgan, Minneapolis, Minn., for appellant; argued by Samuel L. Hanson, Minneapolis, Minn.

Ray H. Walton and Lynn L. Schloesser, Asst. Attys. Gen., Bismarck, for appellee North Dakota Public Service Commission, Bismarck.

Susan W. Rester, Bismarck, for appellee North Dakota Community Action Association.

Myer Shark, Fargo, for appellee Shark Bros., Inc.

SAND, Justice.

This is an appeal by Northern States Power Company [NSP] from a district court judgment affirming an order of the North Dakota Public Service Commission [PSC] which specifically eliminated from NSP's cost of service in North Dakota the sum of $802,275.00 representing a one-year amortization of losses incurred by NSP Wisconsin upon the abandonment of a planned generating unit called the Tyrone Energy Project.[1]

NSP is a Minnesota corporation and NSP Wisconsin is its wholly owned subsidiary. The two corporations coordinate as a single power system, the development and operation of generation and EHV transmission facilities, with NSP serving Minnesota, North Dakota, and South Dakota, and NSP Wisconsin serving Wisconsin.[2] Within their single power supply system the two companies interchange electric energy at wholesale in interstate commerce. Because NSP and NSP Wisconsin are separate corporations exchanging power at wholesale in interstate commerce their intercompany wholesale exchanges of power fall within the jurisdiction of the Federal Energy Regulatory Commission [FERC].

The prescribed procedure for NSP and NSP Wisconsin to operate their integrated system of supplying electrical energy requires submitting their arrangement and the resulting charges between the companies to FERC for its regulation and approval. This procedure uses a formula rate contract known as a coordinating agreement which sets forth how the exchanges of energy between the companies will be accomplished.[3]

In the late 1960's the Tyrone energy project was planned to be built in Dunn County, Wisconsin. Originally, both NSP and NSP Wisconsin had an ownership interest in the Tyrone project; however, the Wisconsin Public Service Commission ruled that NSP could not own an interest in the project because it was not a domestic corporation. See fn. 2. Thereafter, NSP transferred its share in the project to NSP Wisconsin. This transfer was to comply with Wisconsin law and did not reflect any change in the planned use of the project to serve the single system of electrical supply. In 1979 the Tyrone project was abandoned for a combination of reasons. At the time of the abandonment an estimated 75 million dollars in expenses had been incurred.[4]

1. The $802,275.00 represents the cost of service allocated to North Dakota consumers attributable to the Tyrone Project for the test year 1981. The period of amortization was for five years beginning in 1979.

2. The separate corporate entities were necessary to comply with Wisconsin law which requires that a utility business in that state be conducted by a domestic corporation.

3. Pursuant to the coordinating agreement, the exchanges of electricity between NSP and NSP Wisconsin are metered for determining the flow of power and energy between the parties and the corresponding interstate wholesale rates to be paid by one party to the other for electrical energy.

  The mechanics of the exchange, as set forth in the coordinating agreement, provide as follows:

  "7.07 *Statements.* As promptly as practicable after the first day of each calendar month, the parties shall cause to be prepared a statement setting forth the transactions between the parties during the preceding month in such detail and with such segregations as may be needed for operating records or for settlements under the provisions of this agreement.

  "7.08 *Method of Settlement.* Accounts between the parties shall be settled monthly as hereinafter provided. Monthly bills will be prepared for amounts owed by one party to the other for the other party's share of the assignable costs. A written billing statement shall be prepared setting forth in detail the charges and credits to each party and the net balance due. The party owing the net balance due, as set forth in the billing statement, shall pay the other party within 10 days from the date of billing statement."

4. The $75 million was the amount of loss at the time the record before the PSC was made. During oral argument we were told by counsel for NSP that the amount has been reduced by settlement to reflect a loss of $67.1 million. This reduction would be reflected in a corresponding reduction in the $802,275.00 cost of service to North Dakota. However, no figures

On 24 August 1979 NSP and NSP Wisconsin filed an amendment to their coordinating agreement with FERC to allocate the sharing of the Tyrone abandonment loss between the two companies.[5] On 22 Oct. 1979 FERC accepted for filing the proposed amendment to the interstate wholesale rate to take effect retroactively to 7 March 1979. FERC also ordered a public hearing concerning the "justness and reasonableness" of the amendment. The order also contains the following:

> "Our review of the submittal indicates that the proposed amendment has not been shown to be just and reasonable and may be unjust, unreasonable, unduly discriminatory or otherwise unlawful. Therefore, we shall accept the Amendment for filing, grant the Northern States Power Companies' request for waiver, and suspend the Amendment for one day to become effective as of March 7, 1979, subject to refund at the conclusion of this proceeding."

A hearing on the amendment was held before an administrative law judge. The North Dakota Public Service Commission participated in that hearing and resisted including the Tyrone loss in the wholesale rate structure of exchanges between NSP and NSP Wisconsin. The administrative law judge recommended approval of the amendment to the coordinating agreement to allocate the Tyrone loss as a part of the interstate wholesale rate resulting in an adjustment of wholesale rates between NSP and NSP Wisconsin. However, at the time this appeal was taken FERC had not finally approved or disapproved the administrative law judge's recommendation. Between the oral argument in this case and the rendering of the opinion, FERC adopted the recommendation of the administrative

law judge allowing the abandonment expense. Northern States Power Company (Minnesota), Northern States Power Company (Wisconsin), FERC Opinion No. 134, Docket No. ER79–616, issued December 3, 1981.

On 16 May 1980, NSP filed a notice of change in the intrastate retail rates for electrical service provided in North Dakota with the PSC.[6] The rate change was suspended and a hearing was held on the proposed increase. Thereafter, the PSC entered an order on 31 December 1980 allowing an increase in rates of $3,279,000 or 6.68%[7] beginning with meter readings on 1 February 1981. The PSC order specifically eliminated from NSP's cost of service the amortization of losses incurred by NSP Wisconsin resulting from the abandonment of the Tyrone project. In so doing, the PSC decision included the following statement:

> "The Commission acknowledges that it has been an active proponent in the adversary proceedings before FERC. However, it has not formed a judgment dispositive of this issue before this hearing. We could allow the expenses to be imposed on North Dakota rate payers subject to the refund possibility of a final decision of FERC, or we could simply exclude the expense subject to the applicant's right to appeal.
>
> "We elect to pursue the latter alternative and base the rates prescribed herein upon the exclusion of this amortization expense from the test year."

NSP appealed to the district court the part of the order eliminating the Tyrone abandonment expenses from its cost of services. NSP moved for a restraining order pendente lite to permit it to recover its Tyrone-related expenses, subject to refund

---

were presented to reflect the exact amount of the reduction.

5. The amendment reflects an amortization of $75,000,000 over a five-year period commencing on 6 Mar. 1979. The major portion of NSP's share of the Tyrone loss is charged to its customers in Minnesota. The North Dakota allocated portion (i. e., $802,275 per year over a five-year period) is less than seven percent of the total amount. The allocated portions are as

follows: for South Dakota, five percent; for Wisconsin, thirteen percent; and for Minnesota, seventy-five percent.

6. See NDCC §§ 49–05–06; 49–05–07.

7. A technical error in the order was later corrected to change the allowed increase to $3,294,000, or 6.84%.

from its North Dakota consumers. The district court denied the motion and thereafter affirmed the PSC order. NSP appealed to this Court.

Although NSP raises several issues for our consideration, we believe the dispositive issue of this appeal involves the doctrine of federal preemption and whether or not, in an intrastate retail rate proceeding, the North Dakota Public Service Commission has jurisdiction to examine and determine the reasonableness of all of NSP's intrastate retail expenses despite the fact that some retail expenses (i.e., NSP's amortized abandonment losses) were previously allowed as part of the interstate wholesale purchases which were calculated on the basis of interstate wholesale rates filed with FERC.

Initially we note there is no dispute as to the factual background concerning the abandonment of the Tyrone project. Neither is there any dispute as to inferences which may be drawn from the facts. As such, the issue before us becomes a matter of law which is fully reviewable by this Court.

NSP contends that it was obligated by the FERC order to take its share of the Tyrone loss through the coordinating agreement and wholesale charges between the companies, not as a direct amortization, but as an increase in the wholesale charges paid by NSP to NSP Wisconsin. NSP asserts that the impact of the Tyrone loss in North Dakota is through an operating expense called purchase power at wholesale rates, which it asserts is an ordinary operating expense and is a part of a number of purchase power expenses in the test year. NSP asserts that the North Dakota Public Service Commission may not inquire into the reasonableness of the wholesale rate (which includes the amortization for the Tyrone loss) because the Federal Power Act preempted the authority of state commissions to investigate interstate wholesale rates.

NSP relies heavily upon *Narragansett Electric Co. v. Burke*, 381 A.2d 1358 (R.I. 1977), *cert. denied* 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1979), to support its position.

Narragansett Electric Company was a retail electric utility company serving customers in Rhode Island. Its retail rates were regulated by the Rhode Island Public Utilities Commission. Narragansett purchased electrical power from New England Power Company [NEPCO], a Massachusetts corporation. Narragansett and NEPCO were wholly owned subsidiaries of New England Electric System [NEES]. Because NEPCO was an interstate wholesale supplier of electricity, its rates were subject to regulation by FPC (predecessor of FERC). NEPCO filed a rate increase request with FPC. Part of NEPCO's rate increase resulted from losses incurred when it abandoned construction of a generating station. Narragansett subsequently filed a request with the Rhode Island Public Utilities Commission to increase their rates, subject to a possible refund, to cover the increased cost of obtaining power which resulted from the rate increase filed by NEPCO with FPC. The Rhode Island Public Utilities Commission ruled that it could investigate the reasonableness of the costs underlying NEPCO's rate increase filed with the FPC and could prevent Narragansett from passing through to its retail customers any portion of those costs which were "strikingly" or "glaringly" unreasonable.

Narragansett appealed and contended that the Rhode Island Public Utilities Commission lacked jurisdiction to inquire into the reasonableness of NEPCO's wholesale rate to Narragansett because the Federal Power Act preempted the authority of state commissions to investigate interstate prices. The Rhode Island Supreme Court agreed and held that for purposes of fixing intrastate retail rates, the Rhode Island Public Utilities Commission was required to treat NEPCO's interstate wholesale rate filed with the FPC as an actual and reasonable operating expense. Additionally, because the FPC had not finally determined the interstate rate, the Rhode Island Public Utilities Commission had the power to require Narragansett to post bond to reim-

burse the individual consumers for any increased costs which may be disallowed to NEPCO by the FPC.

The PSC contends that reliance upon *Narragansett* is misplaced because the Rhode Island Supreme Court crossed the "bright line" between state and federal jurisdiction in electric utility ratemaking established by the United States Supreme Court in *Federal Power Commission v. Southern California Edison Co.*, 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964).

To help us analyze and resolve these contentions we will consider the historical background of electric ratemaking procedures as affecting interstate commerce and within the doctrine of preemption and the supremacy clause of the United States Constitution. In conjunction with this we must consider that NDCC § 49–02–02 sets out the powers of the PSC with reference to public utilities and provides in subsection 6 as follows:

"6. Require, in its discretion, proof that no unreasonable profit is made in the sale of materials to or services supplied for any public utility by any firm or corporation owned or controlled directly or indirectly by the public utility or any affiliate, subsidiary, parent company, associate, or any corporation whose controlling stockholders are also controlling stockholders of the public utility, before permitting the value of said materials or services to be included in valuations or cost of operations for ratemaking purposes. If unreasonable profits have been made in any such transactions, valuations of said materials and services may be reduced accordingly.

In 1927 the United States Supreme Court, in *Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co.*, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549 (1927) determined that individual states were precluded from regulating wholesale electric rates in interstate transactions because to do so would be a burden on interstate commerce. The regulation of these matters was left to Congress[8] and because Congress had not enacted statutes to regulate the area, the *Attleboro* decision created a vacuum, known as the "Attleboro gap," in the regulation of interstate wholesale electric rates.

Congress undertook federal regulation to fill the "Attleboro gap" through the Federal Power Act in 1935 and the Natural Gas Act in 1938. A declaration of the policy of the Federal Power Act is contained in 16 U.S.C. § 824(a) and provides that:

"Federal regulation of matters of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such regulation, however, to extend only to those matters which are not subject to regulation by the states."

Subsection (b) of § 824 provides that: "The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but shall not apply to any other sale of electric energy."

The United States Supreme Court, in *Federal Power Commission v. Southern California Edison Co.*, 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964), determined that Congress, in enacting the Federal Power Act, intended to vest exclusive federal authority in the Federal Power Commission (forerunner of FERC) to regulate interstate wholesale utility rates. The United States Supreme Court further delineated the congressional intent when it stated:

"What Congress did was to adopt the test developed in the Attleboro line which delineated state power to regulate a sale 'at wholesale to local distributing companies' and allowed state regulation of a sale at 'local retail rates to ultimate consumers.'" 376 U.S. at 214, 84 S.Ct. 650, 651 quoting *Illinois Natural Gas Co. v. Central Illinois Public Service Co.*, 314 U.S.

---

**8.** Article I § 8 of the United States Constitution provides that "Congress shall have power . . . to regulate commerce . . . among the several states."

498, 504, 62 S.Ct. 384, 386, 86 L.Ed. 371, 375 (1942).[9]

The Supreme Court, in *Southern California Edison Co., supra,* went on to say: "In short, our decisions have squarely rejected the view of the Court of Appeals that the scope of FPC jurisdiction over interstate sales of gas or electricity at wholesale is to be determined by a case-by-case analysis of the impact of state regulation upon national interest. Rather, Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction, making unnecessary such case-by-case analysis. This was done in the Power Act by making FPC jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States." 84 S.Ct. at 651.

Based on this, it is apparent that Congress has not prohibited state regulation of some aspects of commerce involved in this case. Rather, there is a dual regulation of electrical utility rates. The result of the Federal Power Act and the cases construing that Act is that FERC has the exclusive authority to regulate all wholesale sales in interstate commerce except those which Congress has made explicitly subject to state regulations. Individual states have the authority to regulate local retail rates to the ultimate consumer. Based on this dual regulation and the "bright line" between state and federal jurisdiction, the PSC asserts that because it alone has the authority to regulate intrastate retail rates, the wholesale rate set by FERC is not binding as an operating expense in a proceeding before the PSC to establish reasonable intrastate retail rates. Further, the PSC points out that it "has not ordered NSP to increase or decrease its interstate wholesale rates," nor has it attempted to set aside the decision of FERC regarding wholesale rates. Thus the PSC asserts that it has not crossed the "bright line" between state and federal jurisdiction.

However, the foregoing is not dispositive of whether or not the PSC, in regulating the local retail rates, must accept the federally regulated and filed wholesale charge between NSP and NSP Wisconsin as a legitimate operating expense and an item of NSP's cost.

■ Congressional enactments that do not exclude all state legislation in the same field nevertheless override state laws with which they conflict. U.S.Const., Art. VI. The criterion for determining whether or not there is such a conflict is whether the state's law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Jones v. Rath Packing Co.,* 430 U.S. 519, 526, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). This inquiry necessitates an inquiry into the relationship between state and federal laws. *Jones v. Rath Packing Co., supra.*

The PSC procedure for regulating public utilities and establishing "reasonable" retail rates for utilities is outlined in NDCC Ch. 49–05. The PSC shall establish rates which shall be "just and reasonable." Implicit in rates which are "just and reasonable," is the right of the utility and its investors to a reasonable return as well as the consumers' right to pay a rate which reflects the cost of service rendered plus a reasonable profit. *Narragansett Electric Co., supra.* These considerations require a determination of the operating expenses of the utility and, in order for an allowance for a return on the investments, the retail rate must be over and above the expenses. In this respect we cannot overlook that NSP is required by the FERC order to pay a fixed wholesale rate for electricity to NSP Wisconsin which includes the amortization of the Tyrone loss.

---

9. *Illinois Natural Gas* was a case under the Natural Gas Act. The United States Supreme Court has said that the relevant provisions of the two statutes "are in all material respects substantially identical." *Arkansas Louisiana Gas Company v. Hall,* —— U.S. ——, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981), citing *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

■ The PSC has no direct jurisdiction over interstate wholesale rates and we believe it would undermine the supremacy clause and the preemption doctrine for the PSC to indirectly assert jurisdiction over the wholesale rates by investigating the reasonableness of underlying costs in a proceeding involving retail rates. Furthermore, we believe it would frustrate the purpose of Congress in establishing reasonable wholesale rates if the reasonableness of these rates as an operating expense were inquired into by and made subject to the North Dakota PSC in establishing reasonable retail rates. If this were permitted the efforts of FERC would be reviewable by the PSC, which was not contemplated by the congressional Act.

We conclude that, for purposes of fixing intrastate rates, the Public Service Commission must treat NSP's filed interstate wholesale rates as a reasonable operating expense.

■ We believe the doctrine of preemption requires that the proper procedure to determine the reasonableness and prudence of the Tyrone loss as it relates to wholesale charges between NSP and NSP Wisconsin is to follow the remedies available in the proceeding before FERC. No valid reason has been presented that a determination of the reasonableness and prudence of the Tyrone loss cannot be adequately resolved through that procedure, which includes appeals to the proper court.

The PSC asserts that even if the allowance or disallowance of the Tyrone-related expenses is subject to preemption, under *National League of Cities v. Usury*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), a congressional regulation of commerce may be an unconstitutional intrusion upon the sovereignty of state and local governments to regulate electric utilities.

We have examined the issue involved in *National League of Cities v. Usury, supra*, and the concept of law announced therein,

and we do not believe that case is applicable to the facts and issues presented by this case.

Pursuant to NDCC § 28-32-19, if the decision of an administrative agency is not affirmed by the court, the decision shall be modified or reversed, and the case remanded to the agency for disposition in accordance with our decision. Accordingly, we reverse the PSC's order and remand the proceeding with instructions that the PSC must treat the rate filed with FERC as an actual operating expense. However, we do so with the understanding that should a final decision of an appropriate court reverse the FERC decision, any increase attributable to the allocated expense resulting from the Tyrone abandonment would be subject to refund. This can be incorporated in the order.

■ NSP also requests the PSC decision be reversed with instructions to immediately authorize rates which recover the full cost of transactions with NSP Wisconsin, as ordered by FERC, retroactive to the date of the PSC's order, 31 Dec. 1980. NSP asserts that although it must bear some of the cost of "regulatory lag" it would not be equitable to impose that burden for the time period after the PSC's 31 Dec. order because the commission intentionally declined the opportunity to protect NSP's recovery by not allowing the expenses to be imposed subject to refund. However, we do not believe that the PSC's actions are so arbitrary or unreasonable as to require retroactive relief.[10] See *Narragansett Elec. Co., supra.*

The Public Service Commission order is reversed and remanded with instructions as set out herein.

Being this is a matter of great interest and concern of the consumer and the general public, each party will bear its own costs and none of the costs will be taxed against the opposing party.

---

10. Because of the conclusions reached in our opinion, we express no views on the wisdom or care exercised by the corporate officers regarding the Tyrone plant. Neither do we express any views whether or not the abandonment cost (expenses) should be borne by the consumers.

ERICKSTAD, C. J., and VANDE WALLE, PEDERSON and PAULSON, JJ., concur.