## WASHINGTON GAS LIGHT COMPANY, Petitioner,

v.

## PUBLIC SERVICE COMMISSION of the DISTRICT OF COLUMBIA, Respondent,

### Gas Research Institute and Office of People's Counsel, Intervenors.

### No. 85–764.

District of Columbia Court of Appeals.

Argued March 26, 1986.

Decided May 9, 1986.

---

Douglas V. Pope, with whom Frank H. Strickler, Washington, D.C., was on brief, for petitioner.

Roberta Willis Sims, for respondent. Howard Davenport, Washington, D.C., also entered an appearance, for respondent.

James M. Broadstone, with whom Peter C. Lesch, Washington, D.C., was on brief, for intervenor Gas Research Institute.

Maureen R. Grady, with whom Frederick D. Dorsey, People's Counsel, Elizabeth A. Noel, Deputy People's Counsel, James R. Haynes, Washington, D.C., and Julia Williams were on brief, for intervenor Office of People's Counsel.

Before PRYOR, Chief Judge, and NEBEKER and TERRY, Associate Judges.

TERRY, Associate Judge:

Washington Gas Light Company (WGL) appeals from an order of the Public Service Commission that will preclude WGL from recovering, as an operating expense, more than twenty-five percent of its wholesale natural gas costs attributable to Gas Research Institute (GRI)[1] surcharges, unless it can prove in future ratemaking proceedings that the surcharges specifically benefit District of Columbia ratepayers.[2] WGL's wholesale natural gas costs, which are regulated by the Federal Energy Regulatory Commission (FERC), include the GRI surcharges.

WGL argues on appeal that the Commission lacks authority to regulate the extent to which WGL may recover, as an operating expense, the portion of its wholesale

---

1. GRI is a non-profit research and development corporation supported by the natural gas industry. Its members include interstate pipeline and distribution companies.

2. The rule also applies to the surcharges imposed on Potomac Electric Power Company by the Electric Power Research Institute (EPRI) to support EPRI's research and development program.

natural gas costs attributable to GRI. This argument is based on two premises: first, that the Commission has acted in contravention of this court's holding in *Washington Gas Light Co. v. Public Service Commission*, 452 A.2d 375 (D.C.1982), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2454, 77 L.Ed.2d 1334 (1983) ("*WGL I*"), and second, that the Commission's order is preempted by federal law under the Supremacy Clause of the United States Constitution. WGL also maintains that even if the Commission acted within its authority, its order is not supported by substantial evidence in the record. The Commission argues to the contrary on all of WGL's contentions, and contends in addition that the issues in this case are not ripe for judicial review. We hold that the preemption issue is ripe for review now, and we agree with WGL that the Commission lacks authority to regulate the extent to which FERC-approved GRI surcharges may be reflected in the retail rates. That in fact is what we held in *WGL I*. We meant what we said in that case, and we adhere to its holding.

## I. The Order Under Review

In August 1982 the Commission initiated Formal Case No. 794, a generic proceeding to examine the benefits to District of Columbia ratepayers derived from the research and development (R & D) programs of GRI and EPRI. The Commission issued a Notice of Investigation and Prehearing Conference, and a hearing agent was appointed to preside over the case.[3]

Testimony relating to benefits derived from particular GRI projects to District of Columbia ratepayers was taken before the hearing agent, and briefs were filed. In August 1983 the hearing agent submitted his Recommended Report, in which he made a finding that District of Columbia ratepayers "have received, and will continue to receive, benefits from GRI research [but that] those benefits tend to defy quantification."

The Commission reviewed the hearing agent's Recommended Report and the record upon which it was based. In Order No. 8005, issued on November 21, 1984, the Commission declined to adopt the recommendation of the hearing agent. The Commission expressed concern over the escalating costs of the GRI program and determined that there was not substantial evidence to support the hearing agent's finding that the program specifically benefited District of Columbia ratepayers. Consequently, the Commission established the following rule governing the treatment of GRI and EPRI expenses in future WGL and PEPCO (Potomac Electric Power Company) rate cases:

> The Commission herein creates a policy and a presumption that twenty-five percent (25%) of the total costs associated with EPRI and GRI directly or indirectly benefit D.C. ratepayers. This determination is based upon the record in this complex proceeding and on our belief that ratepayers should bear their appropriate share of research expenses where

---

3. In Formal Case No. 722, a ratemaking proceeding initiated in 1980, WGL sought to recover, as operating costs, projected increases in the wholesale cost of natural gas attributable to increases in GRI surcharges effective January 1, 1981. The Commission refused to allow such recovery, and WGL appealed.

   That appeal was decided by this court in October 1982, two months after the Commission began Formal Case No. 794. In *WGL I, supra*, we held that the Commission lacked "authority to disallow as a reasonable operating expense the wholesale purchase cost of natural gas approved by FERC, including that portion of wholesale costs attributable to GRI surcharges...." 452 A.2d at 386.

   WGL then moved to dismiss the proceedings in Formal Case No. 794, arguing that our decision precluded further Commission review of the GRI program. The Commission disagreed, and on December 10, 1982, it issued Order No. 7718 denying the motion to dismiss. The Commission concluded that *WGL I* was not dispositive of the issues in Formal Case No. 794, and that there were other areas in which an investigation could uncover information that would assist the Commission in exercising its statutory authority. As a result, the Commission did not change its formulation of the issues in need of resolution in Formal Case No. 794.

the cost of such research is reasonably calculated to reduce utility rates.

To the extent that PEPCO or WGL seek to have D.C. ratepayers pay in excess of 25% of the total EPRI and GRI research expenses, the burden of proof is on each to state the perfected benefit with specific supporting evidence in any application seeking a rate increase or adjustment. The Commission is of the opinion that no party to a rate proceeding should be required to use discovery to ascertain facts which are peculiarly within the possession of the utilities. We expect the companies to fully disclose the facts and to provide the Commission with the underlying basis, cost and benefit formulae, methodology or analysis justifying payment by D.C. ratepayers of such research expenses exceeding 25% of the total cost.

Nothing contained herein is intended to restrict the rights of any party to contest any costs associated with the research expenses. However, as to costs associated with the 25% policy, the burden of proof is assigned to the party contesting the existence of the benefit. The presumption created herein relating to the 25% policy attaches only if the companies set out in detail the EPRI and GRI research utilized to benefit D.C. ratepayers, accompanied by a complete and clear explanation of the benefits (direct or indirect) resulting from such research. Upon such a showing in the application, the presumption of benefit will apply to 25% of the requested research expense, but no more.

Order No. 8005 at 54–55 (footnote omitted).

WGL filed a motion for reconsideration, challenging the Commission's jurisdiction to disallow recovery of any portion of the wholesale natural gas costs previously determined to be "just and reasonable" by FERC. The Commission denied the motion on April 15, 1985, in Order No. 8165, and the rule established in Order No. 8005 thereupon became final. WGL then noted this appeal, in which GRI has intervened on behalf of WGL, and the Office of People's Counsel (OPC) has intervened on behalf of the Commission.

## II. Ripeness

The Commission maintains at the outset that the issues raised by WGL are not ripe for review. Because Order No. 8005 was merely a policy decision to be applied in future ratemaking proceedings, the Commission argues that judicial review will not be appropriate until the rule is implemented in an actual ratemaking case. WGL, on the other hand, contends that the issues are ripe because the pertinent facts are not in dispute, because this court is being asked to resolve strictly legal questions, and because the rule established by the Commission was a "final order." We agree with WGL.

Under D.C. Code § 43–905(a) (1981), this court has

> jurisdiction to hear and determine any appeal from an order or decision of the Commission. Any public utility or any other person or corporation affected by any final order or decision of the Commission ... may ... file ... a petition of appeal....

It is sometimes quite difficult to determine "precisely when an agency has issued a 'final order' and when an administrative action is ripe for review." *Metropolitan Washington Board of Trade v. Public Service Commission,* 432 A.2d 343, 347 (D.C. 1981) (footnote omitted). In this case the Commission captioned Order No. 8005 as a "Final Opinion and Order." Although "[t]he label an agency attaches to its action is not determinative," *Continental Air Lines, Inc. v. Civil Aeronautics Board,* 173 U.S.App.D.C. 1, 18, 522 F.2d 107, 124 (1975) (en banc) (footnote omitted), it is nevertheless "persuasive." *Metropolitan Washington Board of Trade, supra,* 432 A.2d at 349 n. 11. Ultimately, however, we must balance the interests of the court and the agency in deferring review until the issues arise in more concrete form, as in an actual ratemaking proceeding, against the

interests of the party challenging the agency's action, paying particular attention to its "immediate and practical impact." *Continental Air Lines, supra,* 173 U.S.App. D.C. at 18–19, 522 F.2d at 124–125 (footnote omitted).

The leading case on the law of ripeness, especially as it concerns judicial review of agency action, is *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In *Abbott Laboratories* the Supreme Court restated the ripeness doctrine in practical, common-sense terms. According to the Court, the "basic rationale" of the ripeness doctrine

> is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.* at 148–149, 87 S.Ct. at 1515. *Abbott Laboratories* requires this court, in determining whether the Commission's action is ripe for judicial review, to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149. We shall address each factor in turn.

### A. The Fitness of the Issues

■ In deciding whether the issues raised on this appeal are fit for judicial review, we look first to see if they are legal or factual in nature. If the only question presented for review is a "purely legal" one, "we assume its threshold suitability for judicial determination." *Eagle-Picher Industries, Inc. v. Environmental Protection Agency,* 245 U.S.App.D.C. 179, 189, 759 F.2d 905, 915 (1985).

The primary issue on this appeal concerns the doctrine of federal preemption, a question which the Supreme Court has deemed a "predominantly legal" one. *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983). Because no facts relating to the issue of preemption are in dispute, we may go one step further and call it a "purely legal" issue in the context of this case. Thus "we assume its threshold suitability for judicial determination." *Eagle-Picher Industries, supra,* 245 U.S.App.D.C. at 189, 759 F.2d at 915.

Of course, we must also consider the finality of the agency action, and "whether the agency or the court will benefit from deferring review until the agency's policies have crystallized and the 'question arises in some more concrete and final form.'" *Id.* (footnote omitted). As the court explained in *Continental Air Lines:*

> The interest in postponing review is strong if the agency position whose validity is in issue is not in fact the agency's final position. If the position is likely to be abandoned or modified before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempting to reach a final decision.

173 U.S.App.D.C. at 19, 522 F.2d at 125.

The record in this case makes plain that the rule established in Order No. 8005 is the Commission's final position. The order provides that in all future ratemaking proceedings, if WGL proposes to charge District of Columbia ratepayers more than twenty-five percent of its total GRI expenses, the burden of proof will shift to WGL "to state the perfected benefit with specific supporting evidence in any application seeking a rate increase or adjustment." Order No. 8005 at 54. Because the Commission's rule was issued as a "Final Opinion and Order," WGL has no practical choice but to challenge it on this appeal. *See* D.C. Code § 43–905(a) (1981). If we were to hold this controversy not ripe for review, WGL would have to wait and contest the rule in an appeal from the final order in the next rate proceeding, and in the meantime it would be compelled to spend considerable time and resources attempting to prove in the rate proceeding

that District of Columbia ratepayers specifically benefit from the GRI surcharges. Moreover, this court will have to confront the issues raised by WGL sooner or later, and our understanding of those issues is not likely to be "enhanced by the development of a more specific factual background." *Eagle-Picher Industries, supra,* 245 U.S.App.D.C. at 191, 759 F.2d at 917; *see also Continental Air Lines, supra,* 173 U.S.App.D.C. at 20, 522 F.2d at 126 ("Since we will be confronted by this same question whether we grant review now or later, we conclude that the challenged Board policy is, in the appropriate sense, final").

In *Metropolitan Washington Board of Trade, supra,* this court specifically ruled that "in the context of protracted ratemaking proceedings, an agency order establishing basic ratemaking principles may satisfy the requirements of finality and ripeness although the agency formulates the actual rates in a later, related proceeding." 432 A.2d at 348. We held in that case that a challenge to basic ratemaking policies adopted by the Commission for certain electric utility customers, even without reference to specific rates, was ripe for judicial review. In so holding, we said:

> We are not abandoning the requirements of finality and ripeness which generally permit review of only those Commission decisions that are accompanied by specific and concrete rate schedules.... We are simply acknowledging that ... where the Commission has made threshold ratemaking policy decisions and has denominated them as final decisions, and where the court can understand and evaluate these decisions outside the context of a specific rate structure, postponing review would serve no purpose.

*Id.* at 349–350.

Applying the holding of *Metropolitan Washington Board of Trade* to the instant case, we note that the rule established by the Commission in Order No. 8005 is a "threshold ratemaking policy decision" which the Commission itself has character-

ized as a "final" order. There is no reason why this court cannot decide the validity of that rule "outside the context of a specific rate structure," especially since the primary challenge on appeal is to the Commission's authority to promulgate the rule in the first place. Thus we conclude that "postponing review would serve no purpose."

### B. *Hardship to the Parties*

The second element of the *Abbott Laboratories* test is "the hardship to the parties of withholding court consideration." As the court explained in *Eagle-Picher Industries, supra,* "the purpose of the 'hardship to the parties' analysis is to ascertain if the harm that deferring review will cause the petitioners outweighs the benefits it will bring the agency and the court." 245 U.S.App.D.C. at 192, 759 F.2d at 918. In this case it appears that both the agency and the petitioner have an affirmative interest in resolving the matter immediately, rather than in wasting time and money in complying, or requiring compliance, with the rule and litigating its validity thereafter. If we were eventually to declare the challenged rule to be invalid, we might well have to remand the proceedings to the Commission and direct it to make difficult adjustments in its rate order, or perhaps even to start the ratemaking process all over again. Neither the Commission nor WGL would gain anything from that. Arguably, therefore, there are no conflicting interests to balance, and the hardship test need not be addressed. *Id.; see also Osmundsen v. Todd Pacific Shipyard,* 755 F.2d 730, 733 n. 2 (9th Cir.1985).

Nevertheless, even assuming that there are conflicting interests to balance, we believe the balance favors immediate review. In *Continental Air Lines, supra,* the court aptly described the position in which WGL finds itself:

> Characteristically, the hardship of delayed review is that it places those who seek it in the following dilemma: in the meantime they must either comply with the agency's policy, at some expense

which they maintain is unnecessary, or they must risk incurring the sanctions for noncompliance should they turn out to be wrong.

173 U.S.App.D.C. at 20, 522 F.2d at 126.

In the wake of Order No. 8005, WGL is deprived of the assurance that it will recover, as a just and reasonable operating expense (which FERC has determined it to be), that portion of its wholesale costs representing interstate pipeline company payments to GRI. If we decline judicial review at this time, the company will be forced to prove, on an independent record before the Commission, the "perfected benefit"[4] of GRI's research and development program to District of Columbia ratepayers. As GRI points out in its reply brief:

> The burden thereby thrust upon WGL is a significant one. The GRI R & D program approved by the FERC in its latest annual review calls for a budget of $164 million, with which 260 discrete R & D projects, covering diverse and often esoteric fields of endeavor, will be funded. That a meaningful attempt to document and explain the "perfected benefit" of such a program would be a substantial and burdensome undertaking cannot be subject to serious doubt.

WGL is clearly faced with a Hobson's choice. If WGL refuses to assume the heavy burden thrust upon it on the basis that the Commission's rule is legally invalid, and the rule is upheld, its already-slim hopes of cost recovery will be reduced to nil. The potential adverse consequences of non-compliance are, therefore, significant and very real.

To the extent, therefore, that the hardship factor need be addressed at all, it resolves the ripeness issue in favor of WGL. Accordingly, because both parts of

the *Abbott Laboratories* test are satisfied, and because the ripeness doctrine is to be applied in a "pragmatic and commonsense" manner, *Eagle-Picher Industries, supra,* 245 U.S.App.D.C. at 192–193, 759 F.2d at 918–919, we hold that the issue of federal preemption, at least, is ripe for review on this appeal.[5]

### III.  PREEMPTION

Thus we turn to WGL's contention that the Commission lacked authority to promulgate the rule established in Order No. 8005. WGL first argues that the order violates this court's prior holding in *WGL I.* In tandem with that argument, WGL also contends that the Commission is preempted by federal law, specifically the Natural Gas Act, as amended, 15 U.S.C. §§ 717–717z (1982), from regulating in any manner the extent to which WGL may recover the GRI surcharges in its retail rates.

### A.  *The Holding in WGL I*

■ In *WGL I, supra,* we held "that the Commission had no authority to disallow as a reasonable operating expense the wholesale purchase cost of natural gas approved by FERC, including that portion of wholesale costs attributable to GRI surcharges...." 452 A.2d at 386. Therefore, because the Commission had no jurisdiction to determine whether the GRI surcharges were reasonable operating expenses, it was unnecessary for us to reach, *"and the Commission was unauthorized to consider,* the issue whether the GRI charges benefit the District of Columbia ratepayers." *Id.* (emphasis added).[6] Since the Natural Gas Act provides for exclusive federal regulation of interstate sales of wholesale natural gas, "[s]tate and local commissions have no authority ... to inquire into the reasonableness of wholesale rates, but

---

4. Order No. 8005 at 54.

5. Because we hold in WGL's favor on the merits of the preemption issue, as part III of this opinion will reveal, we need not consider either the ripeness or the merits of the other issue raised by WGL, namely, whether the Commission's order is supported by substantial evidence.

6. Several other issues were before the court in *WGL I,* but for purposes of this appeal the only relevant portion of that opinion is found at pages 384–386 of 452 A.2d.

must allow them as reasonable operating expenses." *Id.* at 385–386 (citations omitted).

The holding in *WGL I,* therefore, is simple and straightforward: the Commission has no authority to rule on the reasonableness of GRI surcharges, and likewise has no authority to consider whether, for purposes of rate treatment, GRI surcharges benefit District of Columbia ratepayers. As WGL notes in its brief, our decision in *WGL I* "is supported by a long, unbroken line of state cases involving state regulatory authority over local gas and electric rates." *See, e.g., Public Service Co. v. Public Utilities Commission,* 644 P.2d 933 (Colo.1982) (en banc); *City of Chicago v. Illinois Commerce Commission,* 13 Ill.2d 607, 150 N.E.2d 776 (1958); *Eastern Edison Co. v. Department of Public Utilities,* 388 Mass. 292, 446 N.E.2d 684 (1983); *Northern States Power Co. v. Minnesota Public Utilities Commission,* 344 N.W.2d 374 (Minn.), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 850 (1984); *Northern States Power Co. v. Hagen,* 314 N.W.2d 32 (N.D.1981); *Narragansett Electric Co. v. Burke,* 119 R.I. 559, 381 A.2d 1358 (1977), *cert. denied,* 435 U.S. 972 (1978); *Spence v. Smyth,* 686 P.2d 597 (Wyo.1984).

This clear and unequivocal holding is accompanied by a footnote that appears after a citation to *Public Utilities Commission v. FERC,* 213 U.S.App.D.C. 1, 5, 660 F.2d 821, 825 (1981), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982). In citing that case, we noted that in it "the court ruled that FERC has jurisdiction to approve GRI's program and budget and to rule on applications for rate increases submitted by GRI on behalf of the jurisdictional members." *WGL I, supra,* 452 A.2d at 385. Footnote 15, however, went on to say:

> [N]othing in the holding of the case can be read as extending FERC's jurisdiction to the issue of whether increased wholesale costs shall be passed through to retail customers by the local utility. The determination of the extent to which

wholesale costs should be reflected in local utility rates lies exclusively with local utility commissions. *See Narragansett Electric Co. v. Burke, [supra].*

> The Commission's refusal to allow increased GRI charges to be reflected in retail rates in the instant case, however, was based upon the Commission's erroneous conclusion that the increase in wholesale costs was not a just and reasonable operating expense, rather than upon a determination that the expense should not be passed through to retail customers.

*Id.* at 385 n. 15.

The Commission now cites footnote 15 for the proposition that, although it may not rule that the FERC-approved surcharges are unreasonable operating expenses, it may nevertheless refuse to allow WGL to pass those surcharges on to its retail customers. Thus, the Commission argues, "when this Court said that the Commission must 'allow' wholesale rates as a reasonable operating expense ... this Court merely meant that the Commission could not represent the expenses as unreasonable expenses." And because "[t]he only object foreclosed to the Commission is investigation for the purpose of ascertaining the reasonableness of GRI expenses ... the Commission had authority to establish a methodology which may lead it to disallow, in future rate cases, some or all of WGL's GRI expense."

We cannot accept the Commission's interpretation of *WGL I.* "Under the present law, natural gas owners are entitled to recover from their customers all legitimate costs associated with the production, processing, and transportation of natural gas." *Maryland v. Louisiana,* 451 U.S. 725, 748, 101 S.Ct. 2114, 2130, 68 L.Ed.2d 576 (1981) (citation omitted). If the Commission is without authority to represent the GRI surcharges as unreasonable expenses, then it is also without authority to prohibit WGL from passing those expenses through to the ratepayers. Not only is this result consistent with common sense, but it

is constitutionally mandated, because "under the due process clause of the Constitution no public utility [can] be compelled to absorb its own costs and not pass them on to the consumer." *Public Service Commission v. FPC*, 151 U.S.App.D.C. 307, 316, 467 F.2d 361, 370 (1972).

Moreover, public utilities are required in the District of Columbia to charge rates that are "reasonable, just, and nondiscriminatory." D.C.Code § 43-501 (1981). "This statutory authority is deliberately broad and gives the Commission authority to formulate its own standards and to exercise its ratemaking function free from judicial interference, provided the rates fall within a zone of reasonableness...." *Metropolitan Washington Board of Trade, supra*, 432 A.2d at 350. Nevertheless:

> Implicit in rates which are "just and reasonable" is the right of the utility and its investors to a reasonable return as well as the consumers right to pay a rate which reflects the cost of service rendered plus a reasonable profit.... These considerations require a determination of the operating expenses of the utility and, *in order for an allowance for a return on the investments, the retail rate must be over and above the expenses.*

*Northern States Power Co. v. Hagen, supra*, 314 N.W.2d at 37 (emphasis added).

It necessarily follows, therefore, that if the Commission is required by *WGL I* (as it is) to consider the FERC-approved GRI surcharges as "reasonable operating expenses," then it *must* permit those expenses, *in their entirety*, to be passed through to the ratepayers in a ratemaking proceeding. As another court stated almost forty years ago:

> Expenses (using that term in its broad sense to include not only operating expenses but depreciation and taxes) are facts. They are to be ascertained, not created, by the regulatory authorities. *If properly incurred, they must be allowed as part of the composition of the rates.* Otherwise, the so-called allow-

ance of a return upon the investment, being an amount over and above expenses, would be a farce.

*Mississippi River Fuel Corp. v. FPC*, 82 U.S.App.D.C. 208, 212, 163 F.2d 433, 437 (1947) (emphasis added). This court has likewise held that "operating expenses [which] pertain solely to the supplying of a utility's service ... are chargeable to the ratepayers and directly affect prices paid by the consumer." *People's Counsel v. Public Service Commission*, 399 A.2d 43, 48 (D.C.1979) (citations omitted).

We therefore conclude that the Commission's interpretation of our decision in *WGL I* is contrary to established law. Because FERC-approved GRI surcharges must be considered as reasonable operating expenses, as we made clear in *WGL I*, they are "properly incurred" and "must be allowed as part of the composition of the rates." *Mississippi River Fuel Corp. v. FPC, supra*, 82 U.S.App.D.C. at 212, 163 F.2d at 437. The Commission has no power to rule otherwise.

### B. *The Natural Gas Act*

In 1927, in *Public Utilities Commission v. Attleboro Steam & Electric Co.*, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 54 (1927), the Supreme Court held that the Rhode Island Public Utilities Commission could not regulate the rates at which a Rhode Island utility sold electric power to a Massachusetts distributor. Because regulation by one state of sales made in another state placed "a direct burden upon interstate commerce," *id.* at 89, the Court ruled that the rates were not "subject to regulation by either of the two States in the guise of protection to their respective local interests; but, if such regulation is required, it can only be attained by the exercise of the power vested in Congress." *Id.* at 90, 47 S.Ct. at 296.

When the *Attleboro* case was decided, Congress had not yet enacted any legislation governing the interstate sale of natural gas or electricity. Thus the decision left a void, which came to be known as the "Attleboro gap," in the regulation of inter-

state sales of natural gas. Eventually, however, Congress passed the Federal Power Act in 1935 and the Natural Gas Act in 1938. These Acts created the Federal Power Commission, which later became FERC, and vested it with exclusive authority to regulate the wholesale pricing of electricity and natural gas in interstate commerce. The Natural Gas Act declared that its provisions

> shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural gas companies engaged in such transportation or sale, *but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas* or to the facilities used for such distribution or to the production or gathering of natural gas.

15 U.S.C. § 717(b) (1982) (emphasis added).

Although the Natural Gas Act extended federal regulation to an area of interstate commerce that had previously gone unregulated, it "had no purpose or effect to cut down on state power." *Panhandle Eastern Pipe Line Co. v. Public Service Commission*, 332 U.S. 507, 517, 68 S.Ct. 190, 195, 92 L.Ed. 128 (1947). Rather, "[t]he Act was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way." *Id.* at 517–518. Recognizing the parallel but mutually exclusive regulatory authority of the federal government and the states, the courts have drawn a "wholesale/retail" distinction in the regulation of natural gas: FERC regulates wholesale rates in interstate commerce, and state and local utility commissions regulate intrastate retail rates. *See Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission*, 461 U.S. 375, 377–378, 103 S.Ct. 1905, 1908–09, 76 L.Ed.2d 1 (1983).

The Commission maintains that Order No. 8005 merely regulates the extent to which WGL may pass a portion of its

wholesale costs through to consumers in its retail rates. Relying on this court's dictum in *WGL I* that "[t]he determination of the extent to which wholesale costs should be reflected in local utility rates lies exclusively with local utility commissions," 452 A.2d at 385 n. 15, it asserts that it has acted within its exclusive jurisdiction as a local regulatory agency. In support of the Commission, OPC cites two state cases, *Narragansett Electric Co. v. Burke, supra,* and *Pike County Light & Power Co. v. Pennsylvania Public Utility Commission*, 77 Pa.Commw. 268, 465 A.2d 735 (1983). Neither case supports the Commission's action.

In the *Narragansett* case, a Rhode Island utility attempted to pass through to its retail customers the increased cost of electric power purchased from its wholesale supplier. The utility filed with the Public Utility Commission (PUC) a notice of price adjustment pursuant to the PUC's purchased power cost adjustment (PPCA) regulations. The PUC ruled that although it could not regulate the wholesale rate, which was within the exclusive jurisdiction of the FPC, it could nevertheless investigate the reasonableness of the costs underlying the wholesale rate. The PUC therefore determined that it would prohibit the utility from passing through to its retail customers any portion of the wholesale costs that were "strikingly" or "glaringly" unreasonable.

On appeal, the Rhode Island Supreme Court held that it was improper for the PUC to investigate the reasonableness of the utility's FPC-approved wholesale costs, and that it must treat those costs as reasonable operating expenses. Under the state's PPCA regulations, however, the PUC was not required to adjust the utility's retail rates automatically to reflect the higher wholesale costs. Rather, the PUC was entitled to "treat the proposed rate increase as it treats other filings for charged rates under [a state statute] and investigate the overall financial structure of [the utility] to determine whether the company has experienced savings in other

areas which might offset the increased price for power." 119 R.I. at 568, 381 A.2d at 1363.

Both the Commission and OPC believe that this aspect of the *Narragansett* holding supports the Commission's action. The Commission's rule, they maintain, does not question the reasonableness of the GRI surcharges as operating expenses, but merely focuses on whether the retail rates should reflect the full cost of those surcharges.

A close reading of *Narragansett*, however, makes clear that it does not support the Commission's order. The court in *Narragansett* based its holding on the PUC's broad discretion under applicable state statutes and the PPCA regulations, which gave it the authority to consider factors other than the utility's fuel costs in setting rates. The *Narragansett* decision was not rendered in the context of a general ratemaking case.[7] Moreover, the court said that although the PUC was not compelled to permit the utility to pass the increased wholesale costs through automatically to the retail ratepayers, it could prevent such a pass-through under the PPCA regulations only if "the company has experienced savings in other areas which might offset the increased price for power." *Id.* at 568, 381 A.2d at 1363. In the instant case, by contrast, the Commission's rule permits WGL to pass through only twenty-five percent of the GRI surcharge to its retail customers unless it can prove specific benefit to District of Columbia ratepayers. The rule does not make the pass-through limitation contingent upon offsetting cost savings, which was the only basis on which the

*Narragansett* court said it would be permissible. *Narragansett,* therefore, is of no help to the Commission here.

The *Pike County* case is likewise inapposite. In *Pike County* the Pennsylvania PUC ruled that the utility's reliance on its particular wholesale supplier as a source of power amounted to an abuse of management discretion because alternative, more economical sources of supply were available. Accordingly, the utility's allowable purchased power expense was significantly reduced by the PUC.

The utility appealed the ruling, arguing that the PUC was preempted from disallowing part of its FERC-approved wholesale costs to be passed through to its retail ratepayers. The court disagreed:

> The FERC focuses on Orange & Rockland [the wholesale supplier] to determine whether it is just and reasonable *for that company to charge* a particular rate, but makes no determination of whether it is just and reasonable *for Pike* [the utility] *to incur* such a rate as an expense. The PUC, on the other hand, has no jurisdiction to analyze Orange & Rockland's cost of service data and makes no determination as to the reasonableness for Orange & Rockland to charge its rates. The PUC focuses on Pike and its cost of service data to determine whether it is reasonable for Pike to incur such costs in light of available alternatives. So while the FERC determines whether it is against the public interest for Orange & Rockland to charge a particular rate in light of its costs, the PUC determines whether it is against the public interest for Pike to

---

7. In *Public Service Company v. Public Utilities Commission, supra,* the Colorado PUC denied two gas companies' requests to pass on to their customers, pursuant to an automatic adjustment clause, a cost increase resulting from FERC-approved GRI surcharges. The Colorado Supreme Court ruled in favor of the PUC. Although it acknowledged that "the GRI charge is an added cost of natural gas which the PUC is legally obligated to consider as a reasonable operating expense," 644 P.2d at 940, the court held the PUC was not required to permit the pass-

through under the state's automatic cost adjustment provisions, which vested the PUC with broad administrative discretion. However, the court "emphasize[d] by way of limitation" that this was not a general ratemaking proceeding. If it had been, the court said, it "would not condone PUC action which denies local distributing companies a fair return on the 'investments they necessarily incur in servicing their customers while simultaneously incurring the increased producer prices.'" 644 P.2d at 942 (citation omitted).

pay a particular price in light of its alternatives.

77 Pa.Commw. at 274, 465 A.2d at 738 (emphasis in original).

*Pike County* does not support affirmance of the Commission's rule because the rule does not focus on the alternative sources of natural gas available to WGL. Arguably, if the Commission found that it was feasible for WGL to obtain gas from an alternative source at a more economical rate, it might disallow a portion of the FERC-approved wholesale costs.[8] The Commission, of course, would have to determine that WGL's failure to take advantage of the lowest wholesale price was unreasonable or an abuse of management discretion. But that is not what the Commission purports to do under its new rule, which simply disallows recovery of seventy-five percent of WGL's FERC-approved wholesale costs without considering whether WGL had available to it any alternative, cheaper sources of supply. Since the key to the *Pike County* decision is the availability of alternative sources, and since it does not appear that WGL has any alternative source which would not require it to pay the GRI surcharges, *Pike County* has no bearing on this case.[9]

Moreover, although the Commission's rule, on its face, does not question the reasonableness of the GRI surcharges, and although the Commission concedes that it must consider the FERC-approved wholesale costs as reasonable operating expenses, the rule in actuality does just what is proscribed by the case law. By requiring WGL to prove "the perfected benefit [of the GRI expenses to District of Colum-

bia ratepayers] with specific supporting evidence in any application seeking a rate increase or adjustment,"[10] the Commission is attempting to make its own determination of the reasonableness of those expenses. If WGL fails to meet the burden of proof which the Commission has imposed, it will not be allowed to include the GRI surcharge as part of its operating expenses when the Commission sets WGL's rates. Whatever the Commission wants to call it, the net effect is the same: WGL will be forced to absorb a portion of its FERC-approved expenses without being able to pass them along to its ratepayers. Such a result is forbidden by the Supremacy Clause of the Constitution, as we held in *WGL I.*

■ Thus we conclude that the Commission exceeded its authority in requiring WGL to prove anything at all with respect to the reasonableness of the GRI surcharges. That issue has been preempted *in toto* by the Federal Energy Regulatory Commission. We reiterate what we said in *WGL I:*

> Because we hold that the Commission had no jurisdiction to rule on the reasonableness of such surcharges ... *the Commission was unauthorized to consider ... whether the GRI charges benefit the District of Columbia ratepayers.*

452 A.2d at 386 (emphasis added). To the extent that Order No. 8005 is inconsistent with this holding, it is void and unenforceable. *See People's Counsel v. Public Service Commission,* 444 A.2d 975, 976 (D.C. 1982) ("the Public Service Commission is preempted by the Federal Power Act from reviewing the reasonableness of the whole-

---

**8.** Since the Commission has not made such a ruling here, of course, we do not decide this question.

**9.** *Chesapeake & Potomac Telephone Co. v. Public Service Commission,* 498 A.2d 1167 (D.C.1985), on which the Commission also relies, is not pertinent to this appeal because it presents no issue of federal preemption. In that case we upheld a Commission order allocating between the telephone company and its ratepayers the cost of a certain tax payment, applying the well-

established rule that the Commission has broad discretion in determining the appropriate rate base. Where federal and state (or local) law conflict, however, that discretion is severely limited, because under the Constitution federal law is always supreme. *See Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, supra,* 461 U.S. at 203–204, 103 S.Ct. at 1721–22.

**10.** Order No. 8005 at 54.

sale rate approved by the FERC"); *City of Chicago v. Illinois Commerce Commission, supra,* 13 Ill.2d at 616, 150 N.E.2d at 781 ("the Commission is without power to consider the reasonableness of the FPC rates"); *Eastern Edison Co. v. Department of Public Utilities, supra,* 388 Mass. at 302, 446 N.E.2d at 690 ("the Federal Power Act precludes department review of the reasonableness of [the wholesale supplier's FERC-filed] rate, [and] the department should not have refused to pass these power costs through to [the utility's] customers"); *Northern States Power Co. v. Minnesota Public Utilities Commission, supra,* 344 N.W.2d at 382 ("While [FERC's] determination does not directly establish the return for retail rates, which is in the exclusive jurisdiction of the MPUC, the state utilities commission is required to treat the [FERC-approved] costs as expenses for power purchased in determining the retail rates"); *Northern States Power Co. v. Hagen, supra,* 314 N.W.2d at 38 ("for purposes of fixing intrastate rates, the Public Service Commission must treat [the utility's] filed interstate wholesale rates as a reasonable operating expense"); *Narragansett Electric Co. v. Burke, supra,* 119 R.I. at 567, 381 A.2d at 1362 (the wholesale rate filed with FERC "consti-tutes an actual operating expense and must be so viewed by the PUC"); *Spence v. Smyth, supra,* 686 P.2d at 600 ("Once the FERC proceedings are complete, the [Commission] is required to accept those rates as reasonable, and the [Commission] can do nothing but accept those rates as given").

## IV. CONCLUSION

Because the rule established by the Commission in Order No. 8005 is an attempt to second-guess FERC, thereby interfering with GRI's federally approved program of research and development, it is hereby declared invalid. We hold that the Commission is totally preempted by the Natural Gas Act from determining the reasonableness of the GRI surcharges; hence it is also preempted from considering whether those surcharges, or any percentage of them, benefit District of Columbia ratepayers.

*Reversed.*