### METROPOLITAN BAPTIST CHURCH, Appellant,

v.

### DISTRICT OF COLUMBIA DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS—HISTORIC PRESERVATION REVIEW BOARD and Logan Circle Community Association, Appellees.

### No. 96-CV-1692.

District of Columbia Court of Appeals.

Argued April 6, 1998.
Decided Sept. 3, 1998.

---

Grace E. Speights, Washington, DC, for appellant.

Andrea C. Ferster, Washington, DC, for appellee Logan Circle Community Association.

Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for appellee District of Columbia.

Before STEADMAN and SCHWELB, Associate Judges, and PRYOR, Senior Judge.

STEADMAN, Associate Judge:

The District of Columbia Historic Preservation Review Board, after a public hearing in March 1994, established the Greater Fourteenth Street Historic District. That district included five rowhouses owned by appellant Metropolitan Baptist Church, although not the church's house of worship itself. The church challenges this action.

In this appeal, we are asked to address essentially two issues: (1) did the Board abuse its authority in declining the church's request to continue the public hearing to a future date (or at least to hold the record open for an additional sixty rather than thirty days),[1] and (2) are the church's claims based on the Free Exercise Clause of the First Amendment ripe for review at this point? We affirm the order of the Superior

---

1. A collateral issue is the trial court's refusal to accept four exhibits proffered by the church to support its argument for a continuance or, in the alternative, a full sixty days to submit evidence to the Board. These exhibits were proffered as representing the types of documents the church would have submitted to the Board had it been given more time. The church does not argue that the record actually before the Board failed to support historic designation, but rather that the record would have demonstrated otherwise with the inclusion of the proffered exhibits.

Court answering both these questions in the negative.

## I. BACKGROUND.

In July 1993, the Logan Circle Community Association ("LCCA") submitted an application to the Historic Preservation Review Board for the designation of a new historic district—to be known as the Greater Fourteenth Street Historic District—pursuant to the procedures outlined in 10 DCMR § 2615 (1994).[2] According to the application, the area possessed unique historical and architectural characteristics related to the development of 14th Street, N.W., as a transportation corridor. The boundaries of the proposed district were S Street to the north, 11th and 12th Streets to the east, N and O Streets to the south, and the Sixteenth Street Historic District to the west, all in the northwest quadrant of Washington, D.C.

This area included five rowhouses located between 1701 and 1711 13th Street, N.W., which are owned by appellant Metropolitan Baptist Church. The application described these rowhouses (along with similar properties at two other locations in the proposed historic district) as dating from the late nineteenth century and representing "an undefined, but common, rowhouse form and style.... characterized by multi-storied brick buildings with multi-storied polygonal bays, corbelled cornices, stringcourses and other decorative brickwork." The church's actual house of worship is located near the five rowhouses but was not included in the boundaries of the proposed historic district.[3]

The Board scheduled a public hearing on the matter for March 17, 1994, and published a notice in the District of Columbia Register on January 21 of that year. The notice invited

[i]ndividuals, organizations, public agencies and governmental units, including Advisory Neighborhood Commissions, ... to present their views concerning the significance of the proposed Historic District. Comments may be made in writing to the Historic Preservation Review Board prior to the public hearing and/or by testifying in person or through experts at the hearing.

See 41 D.C.Reg. 246, 246 (1994). LCCA also published a virtually identical notice in The Washington Times on February 4, 1994, to satisfy a regulatory requirement that the applicant arrange to publish notice in a newspaper of general circulation. See 10 DCMR § 2616.1 (1994). In addition, from late 1993 into early 1994, LCCA publicized its proposal by organizing two public informational meetings and distributing letters and leaflets in the affected neighborhood, including a letter and two leaflets delivered to Metropolitan Baptist Church by late January 1994.

Representatives of the church appeared at the hearing to oppose the inclusion of the five rowhouses but also asked that the hearing be continued. Counsel for the church contended that the official notice in the D.C. Register had not afforded his client adequate time to prepare[4] and that he had been retained only the week of the hearing. If the hearing would not be continued, then counsel requested "that the record be held open beyond the normal 30 days so that we would have the opportunity to supplement it." Specifically, the church asked that the record be held open for sixty days after the hearing. The Board proceeded to hold the hearing as scheduled. Besides the proponents of the application, various people spoke both in support of and in opposition to the designation of the historic district.

The Reverend Dr. H. Beecher Hicks, Jr., the pastor of Metropolitan Baptist Church,

---

2. By statute, the Board is authorized to "[d]esignate and maintain a current inventory of historic landmarks and historic districts in the District of Columbia and, in connection therewith, adopt and publish appropriate procedures." D.C.Code § 5–1003(c)(3) (1994).

3. The proposed district also included a sixth property owned by the church in the 1600 block

of 13th Street, N.W., but the inclusion of that property has not been a subject of this litigation.

4. As counsel for the church then explained, "mere publication in the DC Register, while that may be sufficient for individuals, is not in our view sufficient for an institution."

was given ten minutes to voice his opposition to the proposal. At his request, the Board doubled his allotted time to twenty minutes. He explained that his church acquired the first of the rowhouses in 1939 and that at the time of the hearing the five properties provided space for a variety of church projects including a pre-school, a Sunday school, food and clothing distribution centers, and self-help classes. Perhaps more importantly, however, he explained the church's future plan for the properties. Leaders of the church had developed a plan known as "Vision 2000" to expand church ministries by building new facilities on the properties. The church had incurred a debt of approximately two million dollars in connection with the five rowhouses, and a bank had secured the properties as collateral. According to Reverend Hicks, members of the church community would not have invested in these properties over the decades if they had anticipated that their plans would be "so unjustly and unreasonably thwarted" by historic designation.

At the close of the hearing, the Board's chairperson raised the church's request for a continuance in light of the allegedly short notice or, in the alternative, for an additional sixty days to submit documents, and invited a motion from the Board. The movant, Board member Charles Robertson, stated:

> I think the notice issue has been pretty well examined, both the required legal notice and the above and beyond notices that were given to the various parties. I would think that 30 days would be adequate time to respond to testimony here for the record. I mean, this has been a complete[,] thorough hearing, and I think most of the facts were already in the record. But if they're not, of course, any rebuttal or any supplemental information that is relevant to this hearing would be welcomed in the record within those 30 days within which it will be held open.

> So, I would move that the request for a continuance of this hearing, and that the record be held open for 60 days[,] be denied.

The motion, once seconded, was approved by voice vote without a single "nay."

On April 18, 1994—the last day of the thirty-day period following the hearing—the church submitted a six-page letter prepared by counsel again "request[ing] a further hearing ... in order to allow for expanded discussion on the merits of this challenge" to the inclusion of its properties in the proposed historic district. The letter reiterated the church's objections to including the five rowhouses in the district, but the church did not submit any new documentation of its Vision 2000 plans at that time. The Board also received approximately 525 letters which "strongly urge[d] the Board to realign the boundaries of the proposed designation to exclude property belonging to Metropolitan Baptist Church ...."[5]

At its monthly meeting on May 26, 1994, the Board assembled to vote on the proposed Greater Fourteenth Street Historic District. One member, Romaine Thomas, moved to approve the historic district as proposed with the exception of Metropolitan Baptist Church's five rowhouses; as to these properties, Ms. Thomas moved to defer consideration until after further discussion. This motion was defeated by five votes to four. The Board then voted six-to-two, with one abstention, to adopt a staff report recommending designation of the historic district as proposed. On June 16, 1994, the Board officially designated the Greater Fourteenth Street Historic District of a geographic scope that included the church's five rowhouses. Public notice appeared in the D.C. Register on July 22, 1994, with the designation to take effect thirty days later. See 41 D.C.Reg. 4981.

On September 21, 1994, thirty days after the effective date of the historic designation, the church filed an original action in Superior Court challenging the designation.[6] The

5. The Board received a substantial volume of letters and petitions from a variety of individuals, organizations, and institutions, some supporting the designation and others opposing it, either as applied to particular properties or to the area as a whole. Many of these submissions were identical letters.

6. The act authorizing the creation of historic districts at that time contained no provision expressly addressing judicial review of Board deci-

church contended in its complaint that the designation of the entire district and the inclusion of its five rowhouses in particular were not supported by substantial evidence. The church also maintained that the designation of its rowhouses violated its rights under the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act ("RFRA"). *See* U.S. CONST. amend. I; 42 U.S.C. §§ 2000bb to 2000bb–4 (1994). In subsequent pleadings, the church argued that the Board had deprived it of a fair opportunity to be heard by denying its request for a continuance and by holding the record open for only thirty rather than the requested sixty days. LCCA entered the action as an intervenor on behalf of the Board.

■ The trial court ruled that there was a rational basis in the administrative record for the Board's designation of the historic district and its inclusion of the five rowhouses.[7] With respect to the church's religious-freedom claims, the court held that they were not ripe for adjudication because (1) there was no evidence that the church's current use of the rowhouses was impeded by the historic designation and (2) the church's future plans for the properties were not yet impeded because the church was free to apply for a permit to alter or demolish them, and such a permit might well be granted. The trial court held that the Board's decision not to grant a continuance or to extend the time within

which to file additional submissions was within its discretion.

## II. THE REQUEST FOR A CONTINUANCE.

We address first the church's argument that the Historic Preservation Review Board should have agreed to continue the hearing or hold the record open for sixty rather than thirty days. Ancillary to this issue, the church contends that the trial court erred in striking certain exhibits which were offered as examples of the types of documents the church would have presented to the Board had the hearing been continued or the record held open longer. *See supra* note 1.

The trial court found that the Board's designation of the Greater Fourteenth Street Historic District was supported by a "rational basis in the record." According to the church, however, the record on which the trial court relied was "flawed and incomplete" because the Board had denied the church's request to continue the hearing or to hold the record open for a total of sixty rather than thirty days, and thus additional evidence supporting the church's position was improperly excluded from the record under review. In other words, the church does not now question whether the record as it exists provides a rational basis for the Board's decision but instead argues that the Board was required by law to grant its motion for more time. We agree with the trial court that the Board did not abuse its discre-

sions. No party suggests that the proceeding before the Board was a "contested case" and thus subject to direct review in the Court of Appeals, or that the Superior Court action was untimely filed. *See Donnelly Assocs. v. District of Columbia Historic Preservation Review Bd.*, 520 A.2d 270 (D.C.1987); *see also Dwyer v. District of Columbia*, 120 Daily Wash. L. Rptr. 2609 (D.C.Super.Ct. Aug. 14, 1992) (disposing of a post-*Donnelly* original action that challenged the Board's designation of an historic district). As amended in 1998, D.C.Code § 5–1012(b) requires that hearings by the Board on applications for historic landmarks be conducted as contested cases, with an appeal directly to this court; nothing is said in that regard about historic district proceedings.

7. The trial court rejected the church's claim that the "substantial evidence" test applied, reasoning that proceedings before the Board are not contested cases, and citing our decision in *Don-*

*nelly Associates, supra* note 6, 520 A.2d at 276–85. The trial court adopted the "rational basis in the record" standard of review from another Superior Court decision reviewing an historic designation, *Dwyer v. District of Columbia, supra* note 6, 120 Daily Wash. L. Rptr. at 2614. This standard of review for rulemaking has some support in *District of Columbia Hospital Association v. Barry*, 498 A.2d 216, 218 (D.C.1985), and both parties in this case now agree that this was the correct standard of review. Given the issues presented to us on appeal, we have no occasion to decide whether "rational basis in the record" was the correct standard of review for decisions of the Historic Preservation Review Board. We observe, however, that agencies acting in a legislative capacity are not generally limited to the evidence contained in the four corners of the hearing record. *See Citizens Ass'n of Georgetown v. Zoning Comm'n*, 392 A.2d 1027, 1038–39 (D.C. 1978) (en banc).

tion or otherwise err in the denial of the motion.

### A.

■ There is no statutory or constitutional right to a hearing before the Board when it is in the process of designating historic districts. *See Donnelly Assocs., supra* note 6, 520 A.2d at 276–85; *Dwyer, supra* note 6, 120 Daily Wash. L. Rptr. at 2614–15. The Board's rules of procedure, however, provide that "[h]earings shall be scheduled by the Board as needed for the purpose of receiving evidence and testimony on applications for historic landmarks and historic districts." 10 DCMR § 2620.1 (1994).[8] Once a hearing is underway, the rules allow the chairperson to continue it. *See* 10 DCMR § 2620.3(g).

■ With respect to adjudicatory "contested case" hearings, we review an agency's decision to grant or deny a continuance for abuse of discretion. *See Murphy v. A.A. Beiro Constr. Co.*, 679 A.2d 1039, 1042–43 (D.C.1996) (per curiam); *Ammerman v. District of Columbia Rental Accommodations Comm'n*, 375 A.2d 1060, 1063–64 (D.C.1977). However, the type of hearing in this case was more legislative than adjudicatory in nature. *See Dwyer, supra* note 6, 120 Daily Wash. L. Rptr. at 2615. In deciding whether to designate the area historic and, if so, where to draw the boundaries, the Board is "making a policy decision directed toward the general public," which is a legislative process, rather than "weighing particular information and arriving at a decision directed at the rights of specific individuals," which is an adjudicatory process. *See Donnelly Assocs., supra* note 6, 520 A.2d at 278 (quoting *Chevy Chase Citizens Ass'n v. District of Columbia Council,*

327 A.2d 310, 315 (D.C.1974) (en banc)).[9] This view accords with the manner in which we have treated Zoning Commission decisions regarding particular areas. Even though zoning decisions affect specific property owners within a given neighborhood, they are legislative determinations because they also affect the general public and require the digestion of various economic, environmental, and aesthetic considerations. *See Citizens Ass'n of Georgetown v. Zoning Comm'n*, 392 A.2d 1027, 1037 (D.C.1978) (en banc).

■ The distinction between legislative and adjudicatory hearings before an agency may be significant. As this court observed almost twenty years ago, there are fewer procedural restrictions upon an agency hearing when it determines legislative facts because of " 'its more wide-ranging functional emphasis on questions of law, policy and legislatively-conferred discretion rather than on the contested facts of an individual case.' " *Citizens Ass'n of Georgetown, supra*, 392 A.2d at 1039 (quoting *Action for Children's Television v. Federal Communications Comm'n*, 183 U.S.App.D.C. 437, 450, 564 F.2d 458, 471 (1977)). Absent a specific statutory requirement, " 'rule making is not to be shackled . . . by importation of formalities developed for the adjudicatory process and basically unsuited for policy rule making.' " *Id.* at 1041 (quoting *American Airlines, Inc. v. Civil Aeronautics Bd.*, 123 U.S.App.D.C. 310, 315, 359 F.2d 624, 629 (1966) (en banc)). At bottom, the decision of an agency whether to hold a hearing in the course of determining legislative facts, and, if such a hearing is held, its nature and extent, is obviously afforded markedly greater deference than

---

**8.** It is unclear whether the Board's regulations mandate some sort of a hearing in all cases for historic districts. "As needed" would suggest that such hearings may not be required, but the phrase may also refer simply to the timing and number of hearings. Section 2616.1, dealing with notice, purports to prescribe the "[n]otice of a hearing for applications as *required* by § 2615.1" (emphasis added), but nothing in that latter section speaks of any requirement of a hearing or of notice therefor. We are not cited to any other source that might require a hearing or specify the standards therefor. In any event, as indicated in footnote 12 *infra*, our conclusion

would be the same even if the hearing were treated as adjudicatory.

As already set forth in note 4, *supra*, a 1998 amendment now requires contested case hearings on applications for historic landmarks, but not historic districts.

**9.** In *Donnelly Associates*, however, we did not have occasion to determine whether Board hearings are in fact legislative or adjudicatory. We simply concluded that, whether the hearings were legislative or adjudicatory, they were not "contested cases" subject to our direct review. *See* 520 A.2d at 278–79.

when the agency conducts a hearing in the adjudicatory, contested-case situation. *See Chevy Chase Citizens Ass'n, supra,* 327 A.2d at 317 (holding that there is no right to cross-examine witnesses in legislative hearings).

Two cases from other jurisdictions illustrate this general principle in the context of a request for continuance of a legislative-type hearing. In *Edwards v. City Council of Seattle,* 3 Wash.App. 665, 479 P.2d 120 (1970), property owners took issue with the city council's designation of their neighborhood as "blighted" and thus subject to urban renewal programs. The appellants contended, "without citation of authority, that they were deprived of a fair hearing by failure of the City Council to grant a 60-day continuance of the hearing." *Id.* at 123. The court noted that whether to grant a continuance in Washington state trial courts is reviewed for abuse of discretion.

> Surely a legislative body should be held to no higher standard than this, partic[u]larly in view of the less rigid standards applied to legislative hearings.... We certainly can see nothing in this record to indicate an abuse of discretion. The city's legislative body must be given freedom to be about its business, absent ·a showing of arbitrary disregard for the rights of citizens who have shown good cause for continuing business.

*Id.* In *Monarch Cablevision, Inc. v. City Council of Pacific Grove,* 239 Cal.App.2d 206, 48 Cal.Rptr. 550 (1966), a legislative hearing determined which of two bidders would be awarded a community antenna television franchise. Such a hearing was not required by statute or ordinance. The losing bidder applied for writs of certiorari and mandamus in California Superior Court, alleging, *inter alia,* that the council abused its discretion by refusing to allow a continuance so that a witness who testified by affidavit but did not attend the hearing could be cross-examined. The trial court dismissed the petitions, and the court of appeal affirmed. Where a hearing is not required but

> is allowed by legislative grace, it need not be circumscribed by the legal formalities incident to a judicial proceeding. It necessarily follows that here the Council, in

conducting a legislative hearing, did not abuse its discretion.... [W]hile it is true that appellant asked for a two-week delay so that [certain] statements could be rebutted, we cannot say that the Council abused its discretion or denied appellant a fair hearing in refusing to continue the hearing for a period of two weeks.

*Id.* at 554 (citations omitted).

■ We distill the following rule from *Citizens Association of Georgetown, Chevy Chase Citizens Association, Edwards,* and *Monarch Cablevision:* a court must be extremely deferential to an agency's decision to grant or deny a continuance or otherwise accommodate an interested party's demand for additional time in quasi-legislative matters. The standard of review is still abuse of discretion, as in the adjudicatory context, but the range of the discretion is even wider than in a trial-type hearing. As we recognized in *Citizens Association of Georgetown,*

> The Supreme Court has mandated that once a reviewing court has determined whether the agency complied with the procedures required by the relevant statutes: "The [appellate] court should ... not stray beyond the judicial province to explore the procedural format or impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good."

392 A.2d at 1041 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 549, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)).

**B.**

■ With these standards in mind, we hold that the Board did not abuse its discretion in denying the request for a continuance or additional time to supplement the record. The Board in this instance not only followed all applicable procedures but also made an effort, beyond what was required by the regulations, to accommodate interested property owners such as the church. The Board chose to hold a public hearing and issued proper notice well over thirty days in ad-

vance.[10] The pastor of the church, accompanied by counsel, attended the hearing and argued at length for the exclusion of the five rowhouses. The Board accommodated the pastor's request for additional time to testify by doubling his allotted ten minutes. At the end of the hearing, the chairperson invited a discussion of the church's motion for a continuance or sixty days to supplement the record by calling for a vote, even though the Board's own rules place the authority to grant or deny such a motion solely with the chairperson. *See* 10 DCMR §§ 2620.3(g), 2622.1 (1994).

The church did not appear to offer any particularly compelling need for a continuance. *Cf. Edwards, supra,* 479 P.2d at 123 (suggesting that continuance of legislative hearing might be appropriate where property owners have "shown good cause for continuing business"). The church does not claim that the application for historic designation came as any sort of surprise. To the contrary, the record documents lengthy efforts by LCCA to enlist the support of the church as early as January 1994. Other than its unexplained failure to retain counsel until the week of the hearing, the church offered the Board no specific reason why it needed more time to prepare for the hearing or why holding the record open for thirty days would not suffice. Before the Board's unanimous denial of the church's request, the member who made the motion noted that notice of the hearing had been "pretty well examined" and that thirty days "would be adequate time to respond to testimony here for the record." Ad. Rec. 326.

The Board held open the record for an additional thirty days so that parties such as the church could submit further material. Though characterized by the church as "the normal 30 days," even this extension appears to have been an act of accommodation be-

cause the rules mandate that the "record *shall be closed* at the end of the public hearing *except* when directed by the Chairperson to stay open for a specified period of time for the receipt of specific information or additional exhibits." 10 DCMR § 2622.1 (emphasis added). During those thirty days, the church submitted a six-page memorandum prepared by counsel stating its opposition to the proposed historic district, and supporters of the church submitted over 500 letters to the same effect. The Board's rules provide a mechanism for reopening the record "at any time prior to the issuance of a final decision," 10 DCMR § 2622.3 (1994); *see also* 10 DCMR § 2620.3(d), but we see no indication in the record that the church ever availed itself of this possible option.[11] *Cf. Hutchinson v. District of Columbia Office of Employee Appeals,* 710 A.2d 227, 236 (D.C.1998). When the Board finally voted on the proposed historic district, the chairperson indicated that he and his colleagues struggled with the decision and were sympathetic to the church's concerns:

> We do understand the investment that people and institutions have made in their particular properties, some of them quite long-range, and that those parties would like to be able to pursue with [*sic* ] plans of long-standing.
>
> We understand that, and it has been said that some of the vested interests here are people who make a very important contribution to our community. Some of them provide services that are very necessary, that the city cannot afford to provide itself, and therefore it has been difficult.

██ Under these circumstances, we cannot say that the Board abused its discretion in denying the church's request for a continuance or for sixty rather than thirty days to supplement the record. Historic districts

---

10. The rules require the Board to publish thirty-day advance notice of any hearings in the D.C. Register and the applicant to publish notice in a newspaper of general circulation. *See* 10 DCMR § 2616.1. As noted in the statement of facts, *supra* Part I, both of these regulatory requirements were met. The record before us also reflects LCCA's additional publicity efforts in the months leading up to the hearing; these consisted of organizing informational meetings and distributing leaflets to property owners within the proposed historic district, including appellant Metropolitan Baptist Church.

11. It may be, however, that the wording of section 2622.3 that the "Board may reopen the record," with no provision for such a request by a party, limits such a reopening to sua sponte action by the Board.

can be large areas affecting hundreds if not thousands of residents, businesses, and other entities such as the church. If everyone interested in the outcome of an historic-district hearing had the right to a continuance upon the claim that he or she needs more time to prepare, or the right to specify how much time the record should remain open, as a practical matter the Board could no longer hold public hearings. "Some concession to the shortness of life and the volume of public problems must be made if effective legislation for the entire community's needs is to be forthcoming." *Edwards, supra,* 479 P.2d at 122. The Board understandably has to make judgment calls in these matters. Beyond ensuring compliance with the applicable statute and regulations, this court is not in a position to micromanage the Board's conduct of its responsibilities. *See Citizens Ass'n of Georgetown, supra,* 392 A.2d at 1041–42.[12]

### C.

We also affirm the trial court's decision to strike the church's exhibits, which were attached to the church's response to LCCA's initial pleading as illustrations of what the church might have presented had the Board granted a continuance of the March 1994 hearing or held open the record longer. The documents described the church's Vision 2000 project in more detail than described previously. Exhibit A consisted of a church newsletter and minutes from a church meeting, both dated October 1991, which concerned Reverend Hicks's early efforts to explain the project to church members; Exhibit B consisted of minutes from four church meetings dated September 1991 through January 1992; Exhibit C was an exchange of letters dated September 1991 between Reverend Hicks and an architect concerning the church's budget and objectives for the Vision 2000 project; and Exhibit D consisted of undated architectural

sketches, apparently showing the architect's progress on the Vision 2000 project.

The trial court's order striking the exhibits did not explain its reasons for doing so, but was entered in response to a motion filed by LCCA. The motion in essence argued two points: (1) the trial court should limit its review of the Board's decisions to the administrative record and not accept additional evidence, and (2) the exhibits were not probative of any prejudice to the church resulting from the Board's refusal to continue the hearing or hold open the record for a longer period because each document was in existence long before the hearing date and the church could easily have prepared them for submission either before the hearing or within the thirty-day period following it.[13] We shall consider each of these two grounds.

▪ When reviewing contested cases, the Superior Court "must review the administrative record alone and not duplicate agency proceedings or hear additional evidence." *Kegley v. District of Columbia,* 440 A.2d 1013, 1018 (D.C.1982). We have held that an agency making decisions in a legislative capacity is not necessarily limited to evidence within the hearing record, *see Citizens Ass'n of Georgetown, supra,* 392 A.2d at 1038, and we doubt that a trial court would be prohibited in all circumstances from considering additional evidence when entertaining an equitable case challenging a rulemaking. But it appears that both the Board and the parties here proceeded as if the decision should in substance be founded upon the record before the Board, and that the trial court could reasonably take the position that review of the Board's actions, substantive and procedural, should be based upon that record alone as it stood at the time of the Board's challenged decision.

▪ In the same vein, as argued by LCCA in its second point, even to the extent that exhibits might be proffered to illustrate

---

12. The several hearing requirements set forth in the Board's regulations do contain elements typically found in adjudicative hearings. Even if we were to review this proceeding as adjudicatory in nature, we would be unable to find any abuse of discretion by the Board. This case is quite different from *Murphy, supra,* 679 A.2d at 1039, where the need for counsel arose totally unex-

pectedly and where the agency denied the affected party the opportunity for post-hearing submissions.

13. LCCA also argued that in any event the exhibits were not relevant to the church's ultimate religious-freedom claim.

the consequences of the Board's refusal to grant the requested extension of time, the trial court could reasonably take into account the situation at that time with respect to that evidence. As indicated in the above description of the proffered exhibits, all the exhibits with the possible exception of the undated drawings came into existence well over two years before the Board's hearing on this matter. The church had thirty days' notice of the hearing to prepare these documents for submission and, beyond that, an additional thirty days to make them part of the administrative record. The church made no proffer that the documents were particularly difficult to find or otherwise explained its failure to present them within the allotted time. For whatever reason, the church failed to bring these documents to the attention of the Board in a timely manner. As a discretionary matter, the trial court was under no obligation to consider these exhibits as probative of the agency's alleged error in refusing to continue the hearing.

It is also worth noting that Reverend Hicks did explain the Vision 2000 project in general terms to the Board at the hearing, that the six-page memo submitted thirty days after the hearing made similar references to the church's plans for the properties, and that before voting on the proposal the chairperson took special note of "the investment that people and institutions have made in their particular properties, some of them quite long-range," and recognized "that those parties would like to be able to pursue [these] plans of long-standing." In other words, the Board already knew about the Vision 2000 plan, so these four exhibits proffered to the trial court were in a sense cumulative to facts already in the administrative record. *See Morgan v. Foretich*, 528 A.2d 425, 428 (D.C.1987) (recognizing trial court's discretion to exclude cumulative evidence); *Washington Times Co. v. Bonner*, 66 App.D.C. 280, 290, 86 F.2d 836, 846 (1936) (same).

As we have often said in many contexts, even in a jury criminal case the trial court is entrusted with "broad discretion to determine the substance, form, and quantum of evidence," *Hawkins v. United States*, 461 A.2d 1025, 1033 (D.C.1983) (quoting *Johnson v. United States*, 452 A.2d 959, 960 (D.C.1982) (per curiam)), and "broad discretion in deciding the admissibility of evidence," *Morrison v. United States*, 547 A.2d 996, 998 (D.C.1988). "An evidentiary ruling by a trial judge on the relevancy of a particular item is a 'highly discretionary decision' that will be upset on appeal only upon a showing of 'grave abuse.'" *Roundtree v. United States*, 581 A.2d 315, 328 (D.C.1990) (citation omitted). We are quite unable to discern any abuse of discretion by the trial court in its ruling here in a bench review of administrative action.

### III. The Church's Free-exercise Claim.

We now address the church's argument that the trial court erred in determining that its claim under the Free Exercise Clause of the First Amendment was not yet ripe for adjudication.[14]

### A.

The church does not contend that historic designation in any way impedes its current use of the five rowhouses. Because the rowhouses have been designated historic, however, the church would be required to comply with various permit procedures before it could begin renovations as part of its Vision 2000 plan. *See* D.C.Code §§ 5–1004, –1005 (1994) (governing applications to demolish or alter historic properties); *Donnelly Assocs.*, *supra* note 6, 520 A.2d at 271–72 (describing application procedures); 10 DCMR §§ 2505, 2507–08 (1994) (prescribing content of applications to demolish or alter). The church has not applied for such a permit, however, arguing that compliance with these procedures would burden its religious freedom because the permit process would delay the Vision 2000 plan and increase the church's

---

14. In this appeal, the church has argued only that its claim under the free exercise clause is ripe for adjudication; the church has abandoned its RFRA claim, which it pressed before the trial court in 1995, apparently because of the Supreme Court's 1997 decision in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

costs in connection with the renovations. The church asserts that the social ministries to be housed in the new buildings are essential to its religious beliefs. Historic designation, the argument goes, unconstitutionally burdens the church's free-exercise rights because it may not renovate the five rowhouses without first applying for a permit.

The trial court held that the religious-freedom claim was not ripe for judicial decision because it was predicated solely on harm that might occur in the future. The historic designation did not interfere with the church's current use of the properties for its social programs, and, as for the Vision 2000 plan, the church had not even tried to apply for a permit to alter or demolish the properties as it wishes. The trial court noted that such a permit might well be granted with minimal expense and delay.

**B.**

 Although "this court, an Article I court, is not bound by constitutional concerns of ripeness, mootness, and justiciability," we have nevertheless followed these principles as prudential doctrines " 'to promote sound judicial economy' " in recognition " 'that an adversary system can best adjudicate real, not abstract, conflicts.' " *Hessey v. Burden,* 615 A.2d 562, 572 n. 17 (D.C.1992) (quoting *District of Columbia v. Walters,* 319 A.2d 332, 338 n. 13 (D.C.1974)); *see also Smith v. Smith,* 310 A.2d 229, 231 (D.C.1973) (holding that original action was not ripe for adjudication). The purpose of the ripeness doctrine in this context "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Lab. v. Gardner,* 387 U.S. 136, 148, 87

S.Ct. 1507, 18 L.Ed.2d 681 (1967). Whether a claim is ripe for judicial determination is a question of law which the Court of Appeals reviews de novo. *See Lee v. Oregon,* 107 F.3d 1382, 1388 (9th Cir.), *cert. denied,* ── U.S. ──, 118 S.Ct. 328, 139 L.Ed.2d 254 (1997); *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1499 (10th Cir.1995); *Riva v. Massachusetts,* 61 F.3d 1003, 1007 (1st Cir.1995); *Action for Children's Television v. Federal Communications Comm'n,* 313 U.S.App.D.C. 261, 267–68, 59 F.3d 1249, 1255–56 (1995); *Nationwide Mut. Ins. Co. v. Cisneros,* 52 F.3d 1351, 1361 (6th Cir.1995); *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1462 (3d Cir.1994); *Charter Fed. Sav. Bank v. Office of Thrift Supervision,* 976 F.2d 203, 208 (4th Cir.1992); *cf. United States v. Felder,* 548 A.2d 57, 61 (D.C.1988) (discussing this court's standards of review). In rule-making cases, we are to determine ripeness with reference to two criteria: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Abbott Lab., supra,* 387 U.S. at 149, 87 S.Ct. 1507; *accord, Washington Gas Light Co. v. Public Serv. Comm'n,* 508 A.2d 930, 934 (D.C.1986). Under this two-pronged test, we agree with the trial court that the church's free-exercise claim is not ripe for adjudication.

**1. Fitness for Judicial Decision.**

 With regard to the fitness of the issues for judicial decision, the first step is to determine whether the issues raised are legal or factual in nature. *See Washington Gas Light, supra,* 508 A.2d at 934. While purely legal questions may be presumed to be fit for adjudication, *see id.,* the question here would be whether the permit requirements attending historic designation unconstitutionally burden this church's free exercise of religion.[15] The question presented is not purely

---

15. To the extent that the church may be arguing that the mere inclusion of church property used for religious purposes within an historic district subject to a permit requirement is *per se* unconstitutional, regardless of the actual burden that might be imposed by such inclusion, that broad proposition has been rejected in cases with facts considerably more telling than those here. *See*

*Rector of St. Bartholomew's Church v. City of New York,* 914 F.2d 348, 351–52 (2d Cir.1990); *Church of St. Paul & St. Andrew v. Barwick,* 67 N.Y.2d 510, 505 N.Y.S.2d 24, 496 N.E.2d 183 (1986). *See also, e.g., Grace Community Church v. Town of Bethel,* 30 Conn.App. 765, 622 A.2d 591, 595–96 (1993) (zoning ordinance with permit requirement); *City of Las Cruces v. Huerta,*

legal because at this stage of the proceedings, before the church has even attempted to assemble a permit application, we do not know how burdensome the permit requirements may in fact prove to be. All permit applications must include photographs of the building and immediate neighborhood, as well as architectural drawings illustrating the proposed changes.[16] *See* 10 DCMR §§ 2505.2–.4 (1994). Applications for preliminary review must include additionally an approval from the zoning administrator, *see* 10 DCMR § 2505.3(c), while applications for a building permit "shall include, but not be limited to," the photos, drawings, and zoning approval stated above, as well as unspecified other "[m]aterials required by the Department of Consumer and Regulatory Affairs or the Surveyor," 10 DCMR § 2505.2, and, in certain cases, "evidence of the applicant's ability to complete the project," 10 DCMR § 2505.5 (1994). Thus, the specific requirements of any particular application, or the time and expense necessary to prepare it, cannot be determined as a legal matter but depend on the development of facts which are absent from the record before us.

■■■ "[R]ipeness is peculiarly a question of timing," *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), and we should consider whether we would benefit from deferring review until the "'question arises in some more concrete and final form,'" *Washington Gas Light, supra,* 508 A.2d at 934 (quoting *Eagle–Picher Indus., Inc. v. United States Envtl. Protection Agency,* 245 U.S.App.D.C. 179, 189, 759 F.2d 905, 915 (1985)) (other citation omitted). This consideration of concreteness also weighs against adjudication, for several reasons. First, it is not clear in the record that the Vision 2000 program had advanced to such a stage that the church had developed an immediate concrete plan for renovating the properties. At the hearing

before the Board, as well as in the memo submitted to the Board and the pleadings in this case, representatives of the church spoke only in general terms about their intentions to expand the facilities currently available in the rowhouses.[17] Second, even if Vision 2000 has since evolved into a more definite plan for renovating the properties, we cannot say that there is a concrete dispute between the parties in the absence of a decision on a permit application or at least some preliminary steps toward that end; in other words, we cannot conclude that historic designation inflicts a "concrete" injury on the church at this time. *See Smith, supra,* 310 A.2d at 231; *Church of St. Paul & St. Andrew, supra* note 15, 505 N.Y.S.2d 24, 496 N.E.2d at 190–91 (rejecting, on ripeness grounds, church's constitutional challenge to landmark designation, substantially because church had not yet applied for renovation permit). In short, there is no real dispute between the church and the local government, and there is the possibility that none will ever arise.

A final factor bearing on fitness for adjudication is the finality *vel non* of the agency action. *See Washington Gas Light, supra,* 508 A.2d at 934. While the Board's decision to include the five rowhouses in the historic district is final, there is no finality as to the effect of that action upon the church's plans or activities. Thus the effect of being subject to the permit requirements of historic designation is at this stage undetermined. *See Church of St. Paul & St. Andrew, supra* note 15, 505 N.Y.S.2d 24, 496 N.E.2d at 190 (finding lack of finality). We cannot say that there is finality with regard to the church's chief complaint, an alleged unconstitutional interference with its envisioned renovations.

Appellant calls our particular attention to a case from the State of Washington involving that state's landmark designation law, *First United Methodist Church v. Hearing Examiner for the Seattle Landmarks Pres-*

---

102 N.M. 182, 692 P.2d 1331 (App.1984) (same). We know of no subsequent developments in free-exercise jurisprudence to suggest otherwise.

By comparison, recent notable cases reaching the merits of such claims have involved churches which applied for and were denied renovation permits. *See, e.g., Flores, supra* note 14, —— U.S. at ——, 117 S.Ct. at 2160.

**16.** There are already such photographs and drawings in the record before us.

**17.** Indeed, among the four exhibits rejected by the trial court was the architect's concern that the church's plans for the properties were unrealistic given its budget and the size of the site.

*ervation Board,* 129 Wash.2d 238, 916 P.2d 374 (1996).[18] The court struck down the application of that law to the house of worship of the appellant church without requiring that a permit first be sought. The court made clear that it was rejecting any *per se* invalidation of the law with respect to all churches but concluded that the church there had demonstrated that as applied to it, the law significantly burdened its free exercise of religion. *See id.* at 381. Included among those burdens was the inability to readily sell the church property and use the proceeds to advance its religious mission.[19] The court noted that it was resting its decision not only on its interpretation of the federal constitution but also on the Washington state constitution, which provides broader protection to religious freedom. *See id.* at 380–81. In any event, we are not persuaded that the particular record before us, even with the stricken exhibits, presents the question of unconstitutional burden in a sufficiently concrete factual form to ensure that a definitive constitutional ruling at this point would not be premature.

### 2. *Hardship to the Parties if Adjudication is Withheld.*

█ The second prong of the *Abbott Laboratories* test requires us to consider "the hardship to the parties of withholding court consideration." 387 U.S. at 149, 87 S.Ct.

1507. "[T]his inquiry, from the standpoint of the challenging party, entails an examination of the certainty and effect of the harm claimed to be caused by the administrative action: whether it is 'sufficiently direct and immediate' and whether the action's 'effects [have been] felt in a concrete way.'" *Church of St. Paul & St. Andrew, supra* note 15, 505 N.Y.S.2d 24, 496 N.E.2d at 189 (quoting *Abbott Lab., supra,* 387 U.S. at 148, 152, 87 S.Ct. 1507). On the record before us, we are unable to perceive the requisite "certainty and effect" of any alleged hardship. We simply do not know with any precision what would be involved in attempting to comply with the permit procedures. Moreover, any hardship may never arise if the church does not effectuate its Vision 2000 plan in a manner in which the historic designation proves an actual burden. In sum, the church has not shown that historic designation has had a "direct and immediate" effect upon its rebuilding plans or that it has felt the burdens of the permit process "in a concrete way" sufficient to overcome the lack of ripeness.[20]

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed.*

---

18. This case built upon and explained a prior holding to the same effect, also cited by appellant, *First Covenant Church v. City of Seattle,* 120 Wash.2d 203, 840 P.2d 174 (1992). In that case the court found an impermissible burden because the church needed government approval before it altered the exterior of its house of worship and because the landmark designation hurt the church financially by reducing the value of its property by almost half. *See id.* at 183.

19. The church also asserted that the church building was suffering from deterioration and that repairs to the building would be affordable only absent government controls, and that it should be free to designate any portion of the property for commercial use in order to fund religious and social service programs.

20. The church also argues that the permit process would involve an unconstitutional governmental evaluation of its religious reasons for renovating the rowhouses, and tries to analogize *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). But the permit procedures at issue here do not explicitly regulate

the practice of religion, as in *Cantwell;* they simply regulate the manner in which buildings in historic districts may be altered or demolished. Moreover, this argument would strand the church on another ripeness shoal. The mere possibility that the officials reviewing a permit application might assess the merits of the church's religious beliefs is not something this court or any court can consider until such a contingency comes to pass. *See Smith, supra,* 310 A.2d at 231 ("[W]here the ultimate question depends on contingencies which may not come about[,] that question is not ripe for judicial resolution."); *Rector of St. Bartholomew's, supra* note 15, 914 F.2d at 355 ("absent proof of the discriminatory exercise of discretion," court will not entertain argument that landmarks commission *could* exercise unduly broad discretion). The permit proceedings would be conducted in accordance with the District of Columbia Administrative Procedure Act and would be subject to judicial review. *See* D.C.Code § 5–1012(b) (1994).